**GIBSON GUITAR CORP., Plaintiff,**

v.

**PAUL REED SMITH GUITARS, LP, Defendant.**

**No. 3:00–1079.**

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 22, 2004.

As Corrected Feb. 23, 2004.

Edward D. Lanquist, Jr., Waddey & Patterson, Nashville, TN, Jonathan D. Schiller, Kevin R. Anthony, David R. Boyd, Seth Goldberg, Boies, Schiller & Flexner, LLP, Washington, DC, John F. Triggs, Greenberg Traurig, LLP, New York, NY, David Alan Kessler, Greenberg Traurig, LLP, McLean, VA, for Plaintiff/Counter-Defendant.

Alan Dale Johnson, Alfred H. Knight, Willis & Knight, Phillip Lester North, A. Gregory Ramos, North, Pursell, Ramos & Jameson, PLC, Nashville, TN, William D. Coston, Kevin B. Collins, Venable, LLP, Washington, DC, for Defendant/Counter-Claimant.

Joseph D. Lewis, Barnes & Thornburg, Washington, DC, for Perry Palan, Paul Fahrenkopf.

### *MEMORANDUM*

HAYNES, District Judge.

Plaintiff, Gibson Guitar Corporation, filed this action for damages and injunctive relief under the Trademark Act of 1946, the Lanham Act, as amended, 15 U.S.C. §§ 1051 *et seq.* against Defendant Paul Reed Smith, LP ("PRS"). Gibson asserts claims for trademark infringement, counterfeiting, unfair competition and trademark dilution. Gibson's claims involve its

"Les Paul" single cutaway guitar with a body design for which Plaintiff has an incontestable registered trademark. PRS manufactures and sells a PRS "Singlecut" guitar with a design that allegedly infringes on Plaintiff's registered trademark and trade dress. In response to Gibson's complaint, PRS filed a counterclaim (Docket Entry No. 41) seeking a declaration that PRS has not infringed upon any valid trademark or trade dress of Gibson and that Gibson's trademark and trade dress in its Les Paul model guitar are invalid and/or unenforceable.

Before the Court are Gibson's motion for partial summary judgment (Docket Entry No. 61) and PRS's motion for summary judgment (Docket Entry No. 64).

Gibson seeks summary judgment only on its claim that the PRS's "Singlecut" guitar infringes on Gibson's trademark registration No. 1,782,606 (hereinafter "606") for its Les Paul single cutaway guitar. Gibson contends, in sum, that the PRS "Singlecut" infringes on the Plaintiff's registered trademark for its Les Paul guitar, and PRS's "Singlecut" will likely cause confusion in the marketplace as to its source of origin, to Gibson's detriment.

PRS seeks judgment on all of Gibson's claims and its counterclaims and contends,

in sum: (1) that PRS's "Singlecut" guitar does not infringe on Gibson's registered trademark or trade dress; (2) that Gibson's trademark claims are invalid based upon widespread sales of similar single horn shape guitars; (3) that there is not any evidence of actual consumer confusion about the sources of the parties' products at issue; (4) that Gibson's trademark registration was fraudulently obtained; (5) that Gibson's failure to use its registered shape reflects Gibson's abandonment of its trademark; and (6) that Gibson's cited design is functional and generic thereby barring any trademark or any unfair competition claim.

## A. Findings of Facts [1]

### 1. Gibson's Market History

Gibson designs, manufactures and distributes musical instruments, primarily guitars. (Docket Entry No. 79, Defendant's Response to Plaintiffs's Statement of Undisputed Facts, ¶ 1). Gibson has manufactured guitars and other musical instruments for more than 100 years. *Id.* ¶ 12. Gibson's premier product is its Les Paul guitar that has been sold continuously since 1953, but Gibson admits that "it did not manufacture the Less Paul series gui-

1. Upon a motion for summary judgment the factual contentions are viewed in the light of most favorable to the party opposing the motion for summary judgment. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir.1986) *app.* 840 F.2d 16, 1988 WL 12800 (6th Cir.1988) (unpublished opinion). As will be discussed *infra*, under Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), particularly where there has been an opportunity for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The par-

ties have filed extensive responses on their respective statements of undisputed facts. (Docket Entry Nos. 79, 88 and 100). The parties' supporting memoranda refer to the evidence relied upon to support their claims and contentions. (Docket Entry Nos. 61, 74, 78 and 85). Although factual disputes exist, under the applicable law and the Court's conclusion on Gibson's incontestable trademark claim, these disputes are not material. In addition, the factual disputes involve primarily issues of characterization of the evidence or of their legal significance. Under the applicable law, there are not any material factual disputes and this section constitutes findings of fact under Fed. R. Civ. P 56(d).

tar for a number of years during the 1960's." (Docket Entry No. 1, Compl., ¶ 13).

During the 1960's when this guitar was not manufactured, Gibson's Les Paul continued to be played. According to Thomas Wheeler, PRS's guitar expert, the 1960s established the prominence of the Les Paul guitar. (Docket Entry No. 79, Defendant's Response to Plaintiff's Statement. of Undisputed Facts, ¶ 13). Gibson's Les Paul guitar is named after a successful recording artist

whose own name is Lester Polfus—[and who]... in 1949 ha[d] an incredible list of his songs that started with "Lover" in 1949 and ran right on through the Fifties with "Nola," "Tennessee Waltz," "Mocking Bird Hill," "How High the Moon," "the World is Waiting for Sunrise," "Just One More Chane," "I'm Confessin," "Smoke Rings," "Bye Bye Blues," "Tiger Rag," "I'm Sitting on Top of the World," "Vaya con Dies," "I Really Don't Want to Know," "I'm a Fool to Care," "Whither Thou Goest," "Hummingbird," "Moritat," "Cinco Rebles," "Put a Ring on My Finger," and "Jura." Les Paul's success was largely due to the shimmering spatial quality unique to his recordings which was the result of his electronic expertise—his pioneering in multitrack recording and overdubbing and his perfection of the solid body electric guitar, an idea he had been toying with since the Thirties. He built the prototype in 1941. He called it "The Long" and it was nothing but a four-by-four wooden log with strings, a pickup and a plug. It took him several years to convince Gibson that the concept could work and the company finally issued the

Les Paul Standard in 1952. By then, however, he had already built and was using the extremely complicated Les Paul Recording Guitar which he only allowed Gibson to issue in 1971. Les Paul guitars are generally regarded by musicians as the standard ...

(Docket Entry No. 75, Attachment thereto, Exhibit S at 656).

Gibson also sells lower priced versions of its Les Paul guitar under the brand name Epiphone. (Docket Entry No. 79, Defendants's Response to Plaintiff's Statement of Undisputed Facts, ¶ 18). Since 1986, Gibson and Epiphone have sold more that 1.6 million Les Paul single cutaway guitars. *Id.* Gibson sells between forty and fifty percent more Les Paul guitars under the brand name Epiphone. *Id.*

Of Gibson's fifteen (15) guitars in its Les Paul series, two are double cutaway guitars that are not at issue here. (Docket Entry No. 75, at Exhibit X). Although Wheeler, PRS's expert, is aware of the Les Paul double cutaway guitars, when Wheeler uses the term "Les Paul," he is referring only to Gibson's Les Paul single cutaway guitar. (Docket Entry No. 63, Wheeler Dep., at 51). The same holds true for the parties and witnesses as well as the Court.

Gibson's Les Paul single cutaway guitar is a traditionally shaped guitar with a portion removed from body of the guitar where the lower section of the fingerboard meets the body of the guitar (Docket Entry No. 87, Exhibit 22, Carter Report at p. 3).[2] The term "cutaway guitar" denotes that portion of the guitar between the neck and its lowers part, that appears to be missing from the natural, rounded body

---

**2.** For an agreed description of the parts of a guitar, see Docket Entry No. 79, Defendant's Response to Plaintiff's Statement of Undisputed Facts at ¶ 25.

contour. The removal of this portion forms what is often referred to as the "horn." *Id.* One aspect of this horn design is that the musician "can access higher strings, position." (Docket Entry No. 63 Exhibit R, Juszkiewicz Deposition at p. 127).

As to other parts of a guitar, a pickup selector switch allows the player to change quickly the electromagnetic inputs to any one of three options: the pickup closest to the neck (the "neck pickup"), the one furthest from the neck (the "bridge pickup"), or a combination of both. (Docket Entry No. 87 Exhibit 8, Knaggs Deposition at 30–31). The combination of volume and tone knobs for each pickup, allow the player to set the tone and volume of each pickup and, switching among these pickups can achieve different sounds. *Id.* Exhibit 10, Smith Deposition at 127.

### a. Gibson's Trademark

In July 1987, Gibson applied to the U.S. Patent and Trademark Office ("USPTO") to register its "Guitar Body Design." (Docket Entry No. 75, Attachment thereto, Exhibit S at 553). The USPTO examiner twice refused Gibson's registration because the application presented was "merely descriptive," but the examiner allowed amendments to Gibson's application for evidence of secondary meaning. *Id.* at 594, 601. Gibson amended its application with several declarations and historical materials on the distinctiveness of the Las Paul guitar shape. *Id.* at 605–701.

The USPTO then approved Gibson's application and issued the registration. *Id.* at 702. The drawing for the Gibson 606 trademark is set forth below. The picture of the Les Paul single cutaway guitar that was submitted with Gibson's approved trademark application is as follows:

**TRADEMARK
PRINCIPAL REGISTER**

(Docket Entry No. 63, Attachment thereto at Exhibit B).

In March, 1999, Gibson filed a "Declaration of Use And Incontestability Of A Mark Under Sections 8 and 15 for U.S. Trademark Registration No. 1,782,606 for its 'Les Paul'." *Id.* at 713. USPTO granted that request on September 27, 1999. *Id.* at 716.

In its challenge to the validity of Gibson's registered trademark, PRS first cites the statement of Gibson's Vice President Gary Zebrowski to the USPTO that "no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or such near resemblance thereto as may be likely...to cause confusion." (Docket Entry No. 4 PRS Answer., ¶ 45). Zebrowski's sworn statement reads, in pertinent part, as follows:

Gary Zebrowski...declares that he is vice president of Applicant corporation and is authorized to execute this instru-

ment on behalf of said corporation; he believes side corporation to be the owner of the trademark sought to be registered; to the best of his knowledge and belief, *no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or such near resemblance thereto as may be likely, when applied to the goods of such other person,* to cause confusion, or to cause mistake, or to deceive; the facts set forth in this application are true; and all statements made on his own knowledge are true and all statements made on information and belief are believed to be true.

(Docket Entry No. 75, Attachment thereto, at 555–56 Application For Trademark Registration, executed by Gary Zebrowski on July 24, 1987). (emphasis added).

The USPTO record reflects that the USPTO examiner was fully aware and specifically commented that "the particular guitar shape...is used by other manufacturers" (Docket Entry No 63, Exhibit S at 603). Yet, USPTO later granted registration of Gibson's trademark.

PRS's next challenge is Zebrowski' second statement that Gibson's use of the Les Paul had been in "substantial and continued use," *Id.* at 602, given that it is undisputed that for a time Gibson did not manufacture the Les Paul during the 1960's. (Docket Entry No. 74 Gibson's Memorandum at p. 22). In any event, the USPTO was informed that Gibson had ceased the sale of its Les Paul guitar for a period in the 1960 to 1968 (Docket Entry No. 75, Exhibit S, Shaw Affidavit, Exhibit at 636).

The USPTO subsequently registered the mark as incontestable.

PRS next cites the two dimensional drawing in Gibson's registered trademark as not representative of the Les Paul guitar. In PRS's view, the actual drawing submitted to the U.S. Patent and Trademark Office, contains the design of a guitar size, but that drawing is not the precise shape as an actual Les Paul single cutaway guitar (Docket Entry No. 87, Exhibit 36, Knaggs Affidavit, Attachments E and G; Exhibit 19, Reg. No. 1,782,606; and Exhibit 33, Wheeler Report). PRS also cites expert proof that Gibson does not use a two-dimensional silhouette to promote its product to potential consumers as an identification of the source of the product. *Id.* at Exhibit 33, Wheeler Report at 27; Exhibit 4, Carter Deposition at 539–54, 57; Exhibit 3, Wheeler Deposition at 92–93.

PRS asserts that Gibson's two-dimensional drawing is insufficient to communicate the source of its guitar. (Docket Entry No. 87, at Exhibit 4, Carter Deposition at 57, 62–63 Exhibit 43, Fliegler Report at 1–4; Exhibit 33, Wheeler Report at 5–6, 10–11). If the actual three-dimensional shape of the Les Paul guitar is the trademark sought to be protected, PRS contends that Gibson's case must fail. (*Id.* at Exhibit 4, Carter Deposition Tr. 51 Exhibit 26, Beavers Deposition Tr. 19 Exhibit 17, Juszkiewicz Deposition Tr. 27).

Gibson's drawing that was submitted for the USTOP was supplemented by multiple photographs showing the Les Paul Guitar, as well as materials on the guitar's market history (Docket Entry No. 75, Exhibit S, at pp. 561–590.). The picture of the Les Paul guitar submitted to the USPTO and at issue is shown below:

Gibson Les Paul guitar
(from Beauty of the Beast at page 12)

(Docket Entry No. 87 at Exhibit No. 9)

### b. Trade Dress

Gibson lists the elements of its Les Paul trade dress as the placement and arrangement of the tone and volume control knobs and the location of the pickup switch, the Flame Top and Gold Top finishes that are traditionally associated with the Les Paul; the general body shape with a single cutaway horn; and the sunburst color. (Docket Entry No. 87 Exhibit 17, Juskiewicz Deposition at 19 at 20, 24 and Exhibit 31 at Beavers Deposition 403, 405, 407, 409). In its trademark application papers, Gibson identifies the Les Paul singlecutaway guitar by its body shape design that "when customers see this body shape on a guitar they assume that Gibson (on the Les Paul Brand) is the source of the guitar" (Docket Entry No. 75, Exhibit S, Attachment thereto, Shaw Affidavit at 638).

L. Wayne Beavers, Gibson's counsel described the Gibson trade dress as "every-thing you see when you look at the guitar." *Id.* at 33. Beavers also listed "body shape, the headstock shape, the truss rod cover shape, the placement of the knobs, placement of the switch, placement of the pickups, and the tailpiece. There are inlays on the neck." *Id.* Beavers also includes the pickguard, a round washer behind the toggles switch, the separate bridge, and he clarified that certain fretboard inlay shapes are typical of the Les Paul series, such as the pyramid or trapezoid shape. *Id.* at 34.

Gibson provided the following description in its interrogatory response in this action describing its trade dress:

Some of the distinctive features of the Gibson Les Paul guitars recognized by the public to indicate manufacture by Gibson include:

a. The single cutaway at the lower juncture of the guitar's neck and body;

b. The position/placement of the three-way pickup selector on the guitar's upper left bout;

c. The four volume/tone control knobs;

d. The diamond-shaped configuration of the four volume/tone knobs; and

e. The gold-top, sunburst and cherry-burst finishes.

(Exhibit 27, Gibson Response to PRS Maryland Interrogatory No. 2).

PRS cites Gibson's 1998 complaints in several legal actions as containing inconsistent descriptions of its trade dress. In its action against AXL Musical Instrument, Ltd., Gibson's complaint refers to its trade dress of its Les Paul single cutaway guitars cites as follows:

> The Gibson LES PAUL guitar, which is depicted here, contains many unique and distinctive design features in addition to its shape. The lay-out of the knobs on the front face of the guitars is unique to the LES PAUL guitar. The positioning of the pick-ups and the rectangular shape electronics placed on the top surface of the guitar a the bottom end of the strings is very distinctive. The shape and placement of the pick guard, the large plate that is positioned at the pont where the hand strumming the guitar finishes a stroke, is an identifying characteristic. The banding around the outside circumference of the top of the guitar and the "inlay" between the frets on the neck, the ivory or composition inserts that are generally rectangular in nature, are identifying characteristics. The pedhead, the top portion of the neck where the guitar strings connect to the pegs which may be turned to tune the guitar strings, is termed the dove-wing peghead which is distinctive to Gibson's guitars. *Id.* ¶17. Collectively, these

characteristics identify the LES PAUL guitar.

(Docket Entry No. 87, thereto Exhibit 28, at 350).

Gibson's 1995 complaint in an action against Westheimer Corporation referred to the trade dress of its Les Paul single cutaway guitars as "pegheads, including but not limited to distinctive bodies, pickguards, inlays, hardware arrangements, finishes and overall guitar shape and appearances." (*Id.* at Exhibit 29, Westheimer Complaint at 368).

In Gibson's complaint against Kimex Trading Company, the Les Paul trade dress was defined as "including distinctive peghead, body, pickguard, arrangement of and tuning knob designs, and overall guitar shapes and appearances." *Id.* at Exhibit 30, Kimex Complaint at 381–82.

### c. Gibson's Les Paul Guitar's Market Recognition

Gibson's 1958, 1959 and 60 Les Paul guitars have been hailed by the guitar industry as "the most celebrated and sought after electric guitars of the Twentieth Century," (Docket Entry No. 75, Exhibit T, Tony Bacon, *Fifty years of the Gibson Les Paul,* at 735) and the "second oldest solid body six-string to still enjoy superstar status." *Id.* at Exhibit U at 750, *Guitar Player,* "Solid Gold" July 2002.

Wheeler,[3] Thomas PRS's expert acknowledged that the Gibson's Les Paul guitars have been "extraordinarily successful" and are "considered classics," ranking "among a handful of highly esteemed solid bodies." (Docket Entry No. 63, Exhibit R, Attachments thereto Wheeler Deposition at 58–59). Wheeler used the body of a Gibson Les Paul as the only image on his

---

3. Wheeler, a college instructor, has a law degree and has authored a book on guitars, including the Les Paul. (Docket Entry No. 87, Exhibit 33, Wheeler Report at 503). Wheeler has been a consultant to Gibson and describes himself as having a "very strong" friendship with PRS. *Id.* at 424.

book cover. (Docket Entry No. 87, Exhibit 2, Wheeler Report at ¶ 24 and Exhibit H thereto). Wheeler also states:

> Putting it all together: As a modern, single-cutaway, solidbody electric Spanish guitar to be manufactured on a significant scale, it was preceded by the Fender Teecaster.
>
> *While there was nothing new about a modern, single-cutaway, solidbody electric Spanish guitar to be manufactured on a commercial scale, the original Les Paul was nevertheless a crucial design because:*
>
> (1) it was a Gibson (Gibson's stamp of approval helped legitimize the then-controversial concept of the solidbody);
>
> (2) it looked like a Gibson, with its fancy appointments and carved top;
>
> (3) *it became one of the most influential designs in history, directly or indirectly inspiring countless other designs and some outright copies; and*
>
> (4) *it became one of the most popular guitars in history,*

*Id.* at Exhibit 33, Wheeler Report at p. 429. (emphasis added).

In a 1991 deposition, Wheeler opined that guitar purchasers would distinguish the Les Paul from among other expensive guitars: "The Les Pauls are so popular in rock music, I think when a kid opens up a magazine and he sees Slash of Guns and Roses holding a Les Paul Sunburst, he's going to want that guitar whether he's a knowledgeable purchaser or not." (Docket Entry No 63, Exhibit 2, Attachment thereto Wheeler Deposition at p. 108 (adopting his 1991 deposition testimony)). To be sure, Wheeler noted in his deposition in this action, that this phenomenon "might have changed" in succeeding years, but conceded that "I don't know that I can speak to any change in any phenomenon in this respect regardless of this or that date." (Docket Entry No. 63, Attachment thereto, Exhibit R, Wheeler Deposition at 108–10).

PRS's second expert, Richard Fliegler,[4] characterized the Les Paul standard as one of the "yardsticks of the company," and the "flagship of flagships" *Id.* at (Docket Entry No. 63, Exhibit R, Attachment thereto at Fliegler Deposition. at 23.) Fliegler described the Les Paul as "ubiquitous," "venerable name in our industry" and "very, very well-known." *Id.* at 52. Paul Reed Smith, PRS's principal partner conceded that "Gibson makes a Les Paul that's instantly recognized." *Id.* Smith Deposition at pp. 77–78. Smith identified Les Paul guitar by "the shape that's made." *Id.* at 78.

Between 1998 and 2001, Gibson spent more than $2.2 million advertising the Les Paul. (Docket Entry No. 63, Exhibit B, Green Affidavit ¶ 19). Other advertisers of guitars also feature the Les Paul in their advertisements (Docket Entry No 79, Defendants Response to Plaintiffs Statement of Undisputed Facts, ¶ 23; Docket Entry No. 63, G thereto).

A number of books and articles have been written about the Gibson's Les Paul, (Docket Entry No. 79, Defendant's Response to Plaintiff's Statement of Undisputed Facts, ¶ 21), citing Tony Bacon, *Fifty Years of the Gibson Les Paul,* 14–15, 26–27, 34–35, 39, 46–47, 58–59, 74–75, 82–83, 102–103, 111, 118–119 (Backbeat Books 2002) (Docket Entry No. 75, Plaintiff's Supplement Statement of Undisputed Facts, at Exhibits T and W) (showing Les Paul models from 1952 to the present). "The Les Paul Turns 50!" *The Guitar Player,* July 2002 *Id.* at Exhibit U; Tom Wheeler, *American Guitars: An Illustrated History,* at 157–59 (revised and updat-

---

**4.** Fliegler who was graduated from high school with additional study, is a journalist and musician with extensive personal experiences with the guitar and music industry (Docket Entry No. 63, Fliegler Deposition at pp. 5–13).

ed, Harper Collins 1992) *Id.* Exhibit V; Tony Bacon, *Electric Guitars: The Illustrated Encyclopedia,* 112–27 (Thunder Bay Press 2000).

Gibson's Les Paul was featured in the script for a recent episode of the television series "NYPD Blue." *Id.* (Docket Entry No. 63, at Exhibit F). In the episode, there was a murder associated with the theft of a vintage Les Paul guitar. The episode entitled, "Two Clarks In A Bar," depicts the guitar itself and the script refers to the name "Les Paul." *Id.*

### 2. PRS's Market History

PRS began manufacturing guitars in 1985 and traditionally only made "double cutaway" style guitars, with two sculpted "horns." (Docket Entry No. 87 Exhibit 1, Smith Affidavit at ¶ 5). In January, 2000, PRS offered a production model of a single cutaway guitar, the PRS "Singlecut." (Docket Entry No. 88 Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 9). PRS also manufactures and sells the "Tremonti" model, and "Private Stock," single cutaway guitars that Gibson also cites as infringing its registered trademark. *Id.*

### a. PRS's Trademarks

PRS has registered four trademarks for double cutaway guitars. (Docket Entry No. 87, Exhibit Nos. 14, 15, 56 and 57). PRS filed a trademark application for its headstock that Gibson opposed. (Docket Entry No. 98, Exhibit 79). PRS's trademark drawings are as follows:

TRADEMARK
PRINCIPAL REGISTER

TRADEMARK
PRINCIPAL REGISTER

TRADEMARK
PRINCIPAL REGISTER

(Docket Entry No. 87 at Exhibit 13, 14, 56 and 57).

### b. PRS's Single Cutaway Guitar

At an industry trade show in January, 2000, PRS introduced its "Singlecut" guitar (Docket Entry No. 87 at Exhibit 8, Knaggs Deposition Tr. 47, 49, 51, 88–89, 117–118 and Exhibit 9, the PRS Singlecut). PRS's Singlecut utilizes a "scope" on the inside of its guitar's cutaway area (Docket Entry No. 62). The PRS Singlecut guitar has the bird inlays on the fretboard, and the word marks "Paul Reed Smith, on its headstock shape." (Docket Entry No. 87, Exhibit 9). PRS cutaway has hanging tags attached to the guitar at shipment and used at point of sale, to reflect PRS as the manufacturer. (Docket Entry No. 87, Exhibit No. 1, Smith Affidavit at 18). The PRS "Singlecut" is displayed below:

PRS Singlecut guitar
(from www.willcsguitars.co
m/Pages/lbsingle.html)

(Docket Entry No. 87 at Exhibit 9).

PRS contends that the body shape of this guitar was derived from the shape of a PRS production model know as the "PRS Custom 24 Shape" or "Private Stock Guitars" built for a specific customer (Docket Entry No. 87 at Exhibit 10, Smith Deposition Tr. 84; Exhibit 8, Knaggs Deposition Tr. 50, 117; Exhibit 11, computer-aided design ("CAD") drawings, at pp. 201–02). According to Knagg, the model for PRS's new model began in November, 1998 and was completed in March, 1999 (Docket Entry No. 61, Knaggs Deposition at 50–51). That PRS guitar featured a sculpted "horn" or "scoop" *Id.* Exhibit 4, Carter Deposition Tr. 51.

As to the differences between PRS's Singlecut and Gibson's Les Paul, Paul Smith, PRS's principal partner states:

11. In order to clearly identify the PRS Singlecut as a product of PRS, we have included such characteristic and source-indicating PRS features as our own characteristic three-dimensional "scoop" in the cutaway portion of the guitar body, the PRS trademarked headstock shape, the PRS logo on the headstock, distinctive PRS bird inlay on the fretboard, and accompanying materials such as tags that hang from the guitar when it is displayed for sale.

12. Other prominent features of a PRS that are distinct form the Gibson single cutaway Les Paul guitars include a longer scale length, a lack of binding (contrasting color striping around the body and neck), different headstock colors, a vertical instead of a horizontal logo on the headstock, no pickguard, a one-piece bridge, no ring around the toggle switch, a belly carve in the back, a contoured neck joint (as opposed to a right angle), a thinner body, a significantly different outside shape, and a differently shaped truss rod cover.

13. For an electric guitar, the knobs and switches, in terms of their number and their arrangement on the face of the guitar, are functional elements that allow the player to easily modify the vol-

ume and tone of the sound created from the vibration of the strings by the guitar's pickups, and select between the bridge and neck pickups while playing.

14. On the PRS Singlecut, PRS elected to include four knobs to provide the player with separate volume and tone controls for each pickup. The placement of these knobs on the lower part of the guitar is dictated by the fact that on a single cutaway guitar, the lower right portion of the body is the only part of the guitar that provides enough space for the four knobs and the underlying electronics without being in the way of the guitar player's arm as he reaches for the strings. Historically, this is where knobs have always been placed on any electric or acoustic-electric guitar.

15. The placement of these knobs on the lower part of the guitar, relative to the pickups and relative to one another, was determined for ergonomic considerations, after testing within PRS and feedback from players who had tested prototype PRS single cutaway guitars. As a result, the PRS Singlecut's knobs are in completely different positions and are assigned different functions.

16. The pickup selector toggle switch was placed on the upper bout (Exhibit 14, comparison and guitar anatomy illustration) of the PRS Singlecut where it now appears for functional reasons, and as a result of requests from customers, employees, and players of earlier PAS prototypes. These players had played other single cutaway guitars with the selector switch in that position, and so objected to having to adjust to playing with the toggle switch placed elsewhere on the guitar.

17. All production Singlecut guitars sold by PRS feature the trademarked PRS headstock shape, as well as the Paul Reed Smith" logo on the headstock.

18. All production Singlecut guitars sold by PRS are shipped to our retailers with what we refer to as "hang tags," and our retailers display them with these tags. Our hang tags are approximately 4 inches tall by 2 inches wide, dangle from one of the tuning pegs at the top of the guitar, list certain specifications of the particular guitar, and clearly indicate that the guitar is a PRS.

19. All production Singlecut guitars sold by PRS feature the characteristic PRS "scoop," or beveled area, on the inside edge of the guitar's cutaway. This PRS scoop is featured in PRS's other guitar models, as reflected in Trademark Registration Nos. 1,509,200 and 2,043,133. (Exhibit 57, PRS Trademark Registration No. 1,509,200; Exhibit 58, PRS Trademark Registration No. 2,043,133).

20. The body shape of the portion of the PRS Singlecut guitar from the "waist," as we refer to the narrow center of the figure "8" shape of the guitar body, to the bottom end farthest from the guitar's neck, is derived from and consistent with the shape of the double cutaway guitars that my company and I have been making for more than 25 years. This body shape is itself a trademark of PRS, Trademark Registration No. 1,509,200. (Exhibit 57, PRS Trademark Registration No. 1,509,200).

(Docket Entry No. 87, Exhibit 1 at pp. 3–5).

Smith's initial concept for his "Private Stock" model featured three control knobs and a selector switch on the upper shoulder (the bass bout) of the guitar. (Docket Entry No. 79, Defendant's Response to Plaintiff's Statement of Undisputed Facts, ¶ 27–30 and Exhibit J.; Docket Entry No. 63, Smith Deposition at 123–24), but Smith changed the PRS Singlecut design to feature four knobs. *Id.* at 125–26. The four knobs were placed in a configuration in

diamond type configuration. *See* Docket Entry No. 78, at Attachment thereto J, Exhibit 65. PRS had never produced a guitar with four knobs until the PRS Singlecut. (Docket Entry No. 63, Smith Deposition, at 126).

Smith later explained this change to four knob single cutaway over the three knob version as follows:

> [P]eople who learn how to drive a guitar that way are comfortable that way... I look at it like driving a car. The lights are on the left-hand side, the gearshifts' on the right-hand side and the radio's on the right-hand side. The gas pedal's in the middle, the clutch is on the left. If you learned how to drive that way, you never get comfortable driving a different way.
>
> And so the only advantage that I see is that there's a large percentage of the market that wants to be able to control each pickup with a volume control and tone control separately and use the switch as what we call a blower switch... That's the only advantage that I see.

*Id.* at 126–27. Smith conceded that the people in the market whom he described were "persons who formed their habits...playing what would be characterized as a Les Paul style guitars." *Id.* at 129. PRS notes that several other manufactures have the single cutaway with four knobs. (Docket Entry No. 78, Attachment thereto, Exhibit 65 at 861–62, 864, 871–72, 876, 878–79, 881–82, 888).

A trade magazine referred to PRS's Singlecut as follows: "it fills the bill admirably for anyone seeking a classic single-cutaway design and to-die- for tone." (Docket Entry No. 87 at Exhibit 15 at 212). The Guitar Player magazine referred to the PRS Singlecut "as no LP clone."

> Electric guitar has slightly thinner, lighter body with a belly carve and a standard (rather than optional) curly maple top, a longer scale length (25" vs. Gibson's 24¾"), a different dovetail neck joint, a smaller headstock angle, an unbound neck and body (although the body has the distinctive PRS binding-like stripe), a double-action trussrod, abalone or pearl inlays (rather than plastic), and a metal jack plate. There are no metal pointers (Paul Reed Smith calls them "Thumb slicers") on the knobs. Still more differences can be found in the nut material neck shape, pickups, bridge, neck angle relative to the body, and knob location. Gorgeous to behold and a dream to play, the Singlecut deserves a "Best of Show" award.

*Id.* at Exhibit 16.

### c. PRS's Development of the PRS "Singlecut"

Aside from the above references to drawings and the model for the PRS Singlecut, the notes of various PRS staff meetings reflect the context in which the PRS's Singlecut model was actually developed.[5] From the Court's review, the first

---

5. PRS's designated Rule (30)(b)(6) witness Laura Rausch, formerly Laura Griffin, who recorded these meeting notes, confirms that the minutes represent an accurate general characterization of the statements attributed to the participants. (Docket Entry No. 79 Defendants's Response to Plaintiff's Statement of Undisputed Facts at ¶ 31–35). Thus, these notes are admissible as business records. *See* Rule Fed.R.Evid. 803(6). Joe Knaggs, PRS's Director of Research and Development and the head of its "Private Stock" team, was involved both in the design of the PRS single cutaway prototype and its revision, also acknowledged that notes of PRS management meetings accurately reflect his comments that the evolution of PRS design drawings was to reflect "subtle differences from the previous drawing that we had done of our single cutaway guitar to the waist" which caused the design to more closely resemble the Les Paul." (Knaggs Deposition at 112–16). "I think that the notes are accurate

documentary reference to a PRS single guitar is in a March, 1999 "Sales/Marketing meeting": "Single cutaway guitar—recommend we have a meeting to discuss it at the Product Development meeting" and "to get the Gibson Custom Shop/Historical Guitar dealer list off the internet." (Docket Entry No. 63, Attachments thereto, Exhibit K at PRS 843).

At the March 25–26, 1999, quarterly meeting, the discussion of the Single cutaway was" ... good for stealing customers, not plus business. Warren asked how that could be—if you are stealing customers, isn't that plus business. Winn said it is plus business for Les Paul customers, another nail in Gibson's coffin. Paul said that Gibson is in trouble but no emanate (sic) Chapter 11, ...Joe Knaggs...Gibson slack-should we target taking advantage of this now? *Id.* at 0854, 860.

By April 5, 1999, Paul Smith reported that "Guitar Center fired Gibson, Guitar Center is going to press hard for a single cutaway guitar." *Id.* at 0864. A May 26, 1999 "Quote on Private Stock Guitar" list as a "Specification", "57 Les Paul color" (Docket Entry No. 63, Exhibit L).

At a April 13, 1999 meeting, Paul Smith commented that this Singlecut was intended to fill a void in the market created by Gibson's dispute with guitar distributors and retail dealers.

*Paul Smith:*

*Guitar Center has requested a single cutaway.* Had brainstorming session on it with Tom and Winn. Thought we could make the tooling issues on this guitar (unlike the 3 pickup guitar). Will have basses and single cutaway at NAMM 2000.

*John Rausch:*

*Guitar Center is not mad at the Gibson product; they are mad about how Gibson is doing business.*

*Doug Chandler:*

*We can't ignore the fact that people will say this is PRS's Les Paul.* We've said the McCarty is better than Les Paul-will have to be careful how we do this.

*Peter Wolf:*

No market analysis done on single cutaway. All speculation at this point.

*Doug Chandler:*

Best thing to get is just an indication from our dealers. Have to be careful what we will tell them—spread rumors before idea is on drawing board.

*Paul Smith:*

*Isn't the whole idea that dealer are mad at Gibson? Look to us and say. "Can I replace Gibson business with PRS?" Yes, but not really—not one stop. Les Paul player can't be T.O.'d to a McCarty. PRS will put final nail in Gibson's sales with single cutaway. PRS will have complete line. This guitar is about keeping dealers calm.*

*John Rausch:*

*Do we want it to sound like a Les Paul? Part of guitar buying is visual, what the buyer is accustomed to seeing. A Les Paul is sexy and artists are playing it. Don't want to be a knockoff of a Les Paul. In looking at drawing, our guitar is too fat, not sexy.*

*Peter Wolf:*

*No problem if the PRS is built and finished better than a Les Paul.*

*John Rausch:*

Agrees with Doug that Ted is a huge marketing advantage. *If product is right, can T.O. Gibson customers.*

*Doug Chandler:*

in that I was saying that the waist looked more like-more towards a Les Paul, yes, that

would be accurate. ... I was saying that it was more like a Les Paul." *Id.* at 116–17.

The key ingredient of why they want to stay a Gibson dealer is because of Epiphone. John said anyone can be an Epiphone dealer, not anyone can be a Gibson dealer.

*Doug Chandler:*

To make it single cutaway PRS work, need the following:

- Big picture of guitar with Ted, the guy that invented the Les Paul. (Not good marketing policy to mention competitors?)
- Clear family identity with rest of our products.
- $200 more expensive that McCarty, but less expensive than Les Paul.
- "Paul has wanted to have a single cutaway guitar sine opened the doors of this building," quote for advertising purposes.

(Docket Entry No. 87, Exhibit 44 at 1003–04). (emphasis added).

At a June 2, 1999, "Product/Product Development meeting" notes, a section is devoted to the following discussion of a "Single Cutaway Guitar":

*Doug Chandler:*

*Are we happy with people calling it a Les Paul PRS? Do you want to give Gibson credence?*

*Joe Knaggs:*

*If we try to push the envelope to make a guitar that looks like an existing model, shooting ourselves in the foot—'oh, PRS is copying Gibson."*

*Paul Smith:*

*Wants to talk to Les Paul to see if he'll put his name on the single cutaway—offer him more money per guitar.*

*Joe Knaggs:*

Paul Reed Smith is a big enough name. Paul doesn't have anything to do with where we are right now. Ted's name has more value to where we are right now.

*Paul Smith:*

We'll get a lot of press if Les Paul changes companies to PRS.

*Larry Urie:*

We many be perceived that we don't have the confidence to bring it our under our own name.

*Paul Smith:*

People don't feel comfortable playing guitars with people's names on it anymore. *Les Paul is not about the man, about the guitar.*

*Joe Knaggs:*

*Make every effort not to link it to Gibson in anyway. Should just say single cutaway by PRS.*

*John Rausch:*

Every magazine is going to do test between this and the Les Paul. *Recognizable guitar shape-this is a Les Paul.*

*Doug Chandler:*

*Can't delude ourselves. Almost everything on the guitar is a Les Paul. Will be a success because of the brand name. Let's own up to the fact that we're making this guitar because we want to get Gibson's market share.*

*John Rausch:*

We're admitting people play single cutaway because they sound better.

*Joe Knaggs:*

*Are we going to get mileage out of Les Paul's name? Ultimately quality/sound will sell the guitar. We have belly carve that Les Paul doesn't have and we should keep the weight down.*

*Doug Chandler:*

*If get sound right, we'll sell it over Gibson, Don't think we should use Les Paul.*

*Paul Smith:*

*OK, no Les Paul. Larry Thomas is trying to help both PRS and Guitar Center by suggesting Les Paul. Headstocks should not be black.*

*Joe Knaggs:*

Should hollow it out some or will have real bricks coming out of the factory.

*John Rausch:*

Lightness doesn't mean anything if guitar doesn't sound good.

Paul and Joe discussed bringing strings up through the guitar, with ferrels inside the plate increase break angle. Combines Telecaster with Les Paul. Will not be on these 5 protos. Will reevaluate it again when these 5 are done. Paul to write up specs for single cutaway pickups.

(Docket Entry No. 63, Attachment K at PRS 00883–84). (emphasis added).

In a June 2, 1999 meeting, PRS identifies measures that were taken so that the PRS Singlecut would not be mistaken for a Gibson guitar. According to these notes, PRS Singlecut, "headstocks should not be black." *Id.* Exhibit 68, at 884. The notes of a July 14, 1999 "Product Development meeting" reflect comments that "Les Paul is flat. Can we give it PRS cut on top? Will make it look less like a Les Paul. Make it a prototype with the PRS carve..." *Id.* Exhibit 69 at 896.

Joe Knaggs, the PRS Director of Research and Development and head of its "Private Stock" team, was involved in the design of the PRS single cutaway prototype and the revision. (Docket Entry No. 63, Exhibit K at Knaggs Deposition at 8–9). As to the July 1999 meeting, Knaggs acknowledged that accuracy of PRS management meetings minutes in his deposition, *id.* at 117, but subsequently explained his remark about a previous drawing of PRS singlecut hearing bearing a "subtle difference from a Les Paul." According to Knaggs, "we made subtle changes from the previous drawing the waist of the guitar. To the new—the newest drawing of the single cutaway guitar." (Knaggs Deposition At 115–16). Knaggs dated the final design change as occurring in April, 2000, with a deepening of the carve in the small

horn crescent. (Knaggs Deposition at 1290–130). Yet, Knagg stated "the outer dimension of the body and all the rest of it was in place." *Id.*

To differentiate its Singlecut from Gibson's Les Paul, PRS identifies its characteristic "scope" in the cutaway portion of the guitar body, as well as its trademark headstock, logo and accompanying materials such as tags, that hang from the guitar when it is displayed for sale. *Id.*, Exhibit 1, Smith Affidavit ¶ 11; Exhibit 9; Exhibit 46.

### 3. The Guitar Market

The "Musical Instrument Industry" is imposed of three product markets: (1) "Musical Instrument (MI) also called combo—guitars, amps, synthesizers, drumsets and the like"; (2) "Band and Orchestra (B & O)—Horns, Violins...," and (3) "Piano and Organ." (Docket Entry No. 47, Fliegler Report at 744).

In the guitar segment of this market, Gibson's Les Paul and the PRS Singlecut are direct competitors in the higher priced segment of electric guitars. (Docket Entry No. 79, Defendant's Response to Plaintiff's Statement of Undisputed Facts, ¶ 6). Both Gibson and PRS manufacture and sell guitars in the $1,800 to $3,500 price range. *Id.* ¶¶ 5–6. Both now sell single cutaway, solid body, six-string electric guitars. (*See* Docket Entry No. 63, Exhibit B).

Both companies compete in the same market, advertise their guitars in many of the same channels and employ similar marketing strategies i.e., retail stores where customers can personally examine the products. (Docket Entry No. 100, Defendant Reply to Plaintiff's Response to Defendant's Statement of Undisputed Facts, ¶¶ 55–59). PRS's authorized retailers must have "brick and mortar" stores where consumers can handle and play PRS guitars before buying. (Docket Entry No. 87, Exhibit 53, Urie Deposition Tr. 61–62;

Exhibit 10, Smith Deposition Tr. 23; Exhibit 5, Thomas Deposition Tr. 14). PRS will not use retailers who sell only through catalogues or the Internet. *Id.* Gibson likewise distributes its guitars through a network of the same type of authorized retailers. (*Id.* at Exhibit 17, Juskiewicz Deposition Tr. 37:14–39; Exhibit 42, Grundberg Deposition Tr. 51).

Henry Juszkiewicz, Gibson's CEO acknowledges that "most guitar makers sell some single horn models." *Id.* Exhibit 17 Deposition, at 71. Walter Carter, Gibson's expert acknowledged that in this market, there are other guitars "with a general shape of the Les Paul," but "there are not very many within that price range." *Id.* Exhibit R, Carter Deposition, at 62–63. Wheeler, PRS's expert, opines that: "Two-pickup guitars like the PRS Singlecut and the Gibson Les Paul are very common," (Docket Entry No. 87 at Exhibit 33, Wheeler Report, at p. 5). Fliegler, PRS' other expert estimates that 60% of all guitars have two hum bucking pickups, (Docket Entry No. 63, Exhibit R, Fliegler Deposition at pp. 77–78). Yet, Wheeler concedes that:

> "[T]he general shapes of only a few models account for most of the popular electric guitars manufactured in the last 50 years. Those original seminal models include for example: Gibson's Les Paul, and to some extent its SG, ES–335, Flying V and Explorer; as well as Fender's Telecaster and Stratocaster. Not all guitars fall into these body-shape categories, of course, and some variations are closer to the originals than others. But the fact remains: *only a few models' shapes or outlines dominate the market."*

*Id.* at 17 (emphasis added)

Wheeler, PRS's expert identifies the Telecaster as a six-string, two-pickup, solid body, single cutaway electric guitar, and as Les Paul's predecessors in the single cutaway guitar. According to Wheeler, Gibson introduced its Les Paul guitar to compete with the Telecaster. (Docket Entry No. 63, Exhibit R, Wheeler Deposition at 53–57). The shape of the Telecaster has the "horn" of the guitar, but has two control knobs, not four. (Docket Entry No. 75 at Exhibit BB). The Telecaster also lacks the diamond pattern of knobs of the Les Paul and the toggle switch was placed in a straight line with the knobs on the lower portion of the guitar. *Id.* (Docket Entry No. 87 at Exhibit 2, Wheeler Report at 17).

Catalogues and advertisements reflect various guitars in the market bearing the body shape similar to Gibson's Les Paul model guitar. (Docket Entry No. 87, Defendant's Exhibits. 7, 11, 12, 15, 24, 25, 33, 27, 38E, 39, 47–52, 65). Yet, a Guitar trade magazine opined, about guitar designs "Most of us simply have no respect for anything that is not shaped like a Les Paul, strat[ocaster], flying V, Tele[caster] or one of the other designs introduced back when Eisenhower was watching the Ed Sullivan show." *Id.* at Exhibit 41, GuitarWorld.com article, printed 3/13/01. According to Smith, PRS's principal partner for years, he has observed guitars with the style of Gibson's Les Paul single cutaway "in almost every guitar booth" at industry trade shows, (Docket Entry No. 63, Smith Deposition, at 79). Thus, PRS did not believe that Gibson could assert a trademark interest in the shape of its Les Paul single cutaway guitar *Id.*

Nine guitars feature a pickup selector switch on the upper left bout of the guitar. The Gretsch Synchromatic, the Heritage H–150, the Dean Evo, the DeArmond M–75, the Hamer Slammer Special 2, the Kendrick Townhouse, the Austin Guitars Vintage Rock. (Docket Entry No. 87, Exhibit 37, Attachments to W. Coston letter of 4/10/01, Attachments A–D; Exhibit 38, Gibson's First Responses to PRS Interrog-

atories No. 14 at Tab E; Exhibit 3, Wheeler Deposition Tr. 111–114). Other guitars have four knobs on the lower right and a pickup selector switch on the upper left bout, with a total of more that 130 compiled by Wheeler, PRS's expert. (Docket Entry No. 87, Exhibit 3, Wheeler Deposition Tr. 111:18–112:13; Exhibit 33, wheeler Report 5/11/01, at Attachment 2).

The sunbursts on Gibson's Les Paul is also used in different ways by other guitar manufacturers, but the effects of the various sunbursts differ. (Docket Entry No. 87, Exhibit 37, W. Coston letter of 4/10/01, attachments A–D; Exhibit 38, attachments to PRS Interrogatory No. 14 at Tab E of Gibson's First Interrogatory Responses).

As to retail customers in this market, Lawrence Thomas, a retailer, explained customers for Gibson guitars typically ask salespeople about the guitar, but these "customers either price point or else they know what they want or they are looking for a particular sound or they are looking for a particular feel or the have seen or asked on TV or you know, in concert playing it." (Docket Entry No. 87, Thomas Deposition Tr. 12–13). Wheeler, PRS's expert, opines on these customers' that:

Expensive guitars are not "impulse items." Their purchase is typically preceded by at least a bit of research, often a lot of research.

Given their resources, buyers may be well educated, sophisticated even, before entering the store. They may know exactly what they want, having already studied various models in books and magazines, read numerous user reviews on the web, compared features and photos in catalogs and on company websites, tried out the guitars, etc. Or, they may come into the store at the beginning of their search, eager to learn.

Conversations between guitar retailers and buyers (or potential buyers) invariably cover a model's manufacture, its features, its price, and other aspects typical of any substantial retail purchase.

(Docket Entry No. 33, Wheeler Report at 16).

### 4. Confusion in the Market Place [6]

██ As to evidence of confusion in the marketplace between Gibson's Les Paul and PRS's Singlecut guitar, Walter Carter,[7] Gibson's expert witness experienced

---

6. PRS objects to much Gibson's evidence on confusion in the marketplace as hearsay. The Court deems the disputed evidence to be exceptions to the hearsay rule under Fed. R. of Evid. 803(1) and (3) as statements of present sense impressions and under Rule 803(1) because the statements "describ[e] or explain[ ] an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Further, the statements describe the declarants' "then existing state of mind" under Rule 803(3) as to their confusion between PRS Singlecut and Les Paul guitars. See, e.g., *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227–29 (2nd Cir.1999) (admitting under Fed. R. Evid. 803(1) survey evidence in Lanham Act claim consisting of physician respondents' impressions of communications for purpose of establishing a pattern of implied falsehood); *Piper Aircraft*

*Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 928–30 (7th Cir.1984) (admitting survey responses establishing actual confusion among respondents as to origin of aircraft parts) Responses were present sense impressions and descriptions of then existing states of mind under Fed. R. Evid. 803(1) and (3). In any event, this evidence is not controlling on the Courts conclusions of law.

7. Carter who has a Bachelors of Arts in Radio, Television and Motion Pictures, authored a book on Gibson for which Wheeler PRS's expert was a contributing author (Docket Entry No. 63, Exhibit R, Carter Deposition at pp. 17–18). Carter is a song writer, journalist, freelance writer and part-time college instructor who also worked for Gibson, as a song writer and writing articles about the instruments. *Id.* at 23–26. Carter was retained as

initial confusion when he saw PRS Single-cut guitars on display in the Gruhn Guitars in Nashville. (Docket Entry No. 63, Exhibit R, thereto Carter Deposition at 48–49) Carter stated. "Just looking at the guitars on the wall, I initially thought I was looking at Les Pauls, and on a closer look, I saw I wasn't." *Id.* Dave Berryman, Gibson's President described his son and several of his son's acquaintances as mistaking a PRS Singlecut for a Les Paul guitar while watching music videos on MTV. (Docket Entry No. 63 Exhibit R, Berryman Deposition At 54–68). Similarly, Edwin Wilson observed a friend and fellow guitar-player viewing a photograph in a magazine of a PRS Singlecut in the "Guitar Player" magazine and initially identified the guitar as a Gibson's Les Paul. (Docket Entry No. 75, Exhibit W, Wilson Deposition at 46–50).

Wheeler, PRS expert, agreed that a potential buyer may mistakenly believe that a PRS Singlecut guitar was a Gibson Les Paul. (Docket Entry No. 63, Exhibit R, Wheeler Deposition at 72, 84). Smith conceded that, beyond a certain distance "the only thing you can really make up [out] is the shape and whatever is going on in the body," and in that context, the audience would identify the guitar by it body. Id. at Smith Deposition at 86–87. Later, Smith asserted that he could detect differences in the body of a guitar from a distance of 50 yards. Id. at 88–90.

PRS has sold the Singlecut guitar for two and one half years and PRS has not experienced a single instance of reported actual confusion with the Les Paul. (Docket Entry No. 87, Exhibit 1, Smith Affidavit at ¶ 35; Exhibit. 5, Thomas Deposition Tr. 36–37).

an expert for this action, but has since returned to Gibson and continues as its editorial

### 5. Functionality

The issue of functionality involves around the pickups and knobs and guitar as well as the shape of the horn. PRS cites Juszkiewicz's testimony that the cutaway shape gives the player access to the strings. (Docket Entry No. 63, Exhibit R, Juszkiewicz Deposition p. 127). Smith, PRS principal partner refers to the knob placement as for "ergonomic considerations." (Docket Entry No. 87, Exhibit 1, Smith Affidavit at ¶ 15).

The pickup knob is an "electro magnetic transducer that captures the motion of the strings in a magnetic field and therefore, turns it into an analog sound signal." (*Id.* Juszkiewicz Deposition Tr. 19: 25–26). The knobs control the volume and tone. *Id.* at 26. The choice between pickups provides the player with a choice in sound. (*See Id.;* Exhibit 33, Wheeler Report, at p. 5; Exhibit 10, Smith Deposition Tr. 127:6–12). As to the configuration of knobs and toggle switch, not all single cutaway guitars have the Les Paul diamond configuration, as reflected by the Fender Telecaster. *See* Docket Entry No. 75 at Exhibit S at 574, 583, 698–700.

From the Court's review, single cutaway guitars have a variety of shapes and angles of their "horns." (Docket Entry No. 47, Flielger Report, Attachment thereto). In addition, the location of the knobs are in different locations on the various guitars (Docket Entry No. 87, Exhibit 7, 16 and Exhibit 38 at 692) and (Docket Entry No 63, Exhibit U at 757, and Exhibit B at 770).

### 6. Gibson's Enforcement Actions

In March, 2000, Gibson sent PRS a cease and desist letter, regarding the "PRS Singlecut" guitar. Gibson asserted

director *Id.* at 26–28.

that PRS's Singlecut guitar violated Gibson's trademark and trade dress rights in its Les Paul guitar, and further alleged unfair competition and false advertising. Gibson's cease and desist letter, cited its registration and stated "...[y]ou clearly copied many features of the trade dress of the GIBSON LES PAUL which further add to the confusing similarity of the appearance of the PRS Singlecut and the GIBSON LES PAUL. Those features *include* the diamond pattern four knob central layout, the placement of the switch, and the type and arrangements of pickups and tailpiece. This is further compounded by your adoption of the "flame tip" and "Gold Top" color patterns, which are closely associated with the GIBSON LES PAUL GUITAR" (Docket Entry No. 87 at Exhibit 18). (Docket Entry No. 100, Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Facts, ¶ 21). *Id.*

PRS cites Gibson's three settlements, with guitar makers Heritage, Dillion, and Westheimer (Docket Entry No. 87 at Exhibits Nos. 24, 25 and 52), as Gibson's admissions that its designs are not protectable trademarks or trade dress. The Heritage settlement agreement reflects that Heritage agreed to cease its manufacture of several models of guitars that Gibson contended were similar to its Les Paul mark. (Docket Entry No. 24 at p. 276). "Gibson agrees that the Heritage production model guitar with all of the modifications set forth above do not violate" its settlement agreement that forbids use of "any design or configuration substantially or confusingly similar" to certain Gibson guitars, including the Gibson single cutaway Les Paul. (*Id* at 276–78). Several exhibits attached to the agreement show the guitars that with modifications, would not violate Gibson's trademark. *Id.* at 278, 303–06.

Gibson's settlement agreement with Dillion guitars is a fax letter from Gibson's counsel that attaches drawings to reflect which designs of the Dillon guitars were acceptable to Gibson (Docket Entry No. 87, Exhibit 25, letter agreement with attached design drawings, at 314). PRS cites Mr. Beavers mark of "OK" as Gibson's approval of another guitar design comparable of Gibson's Les Paul style. (*Id.* at 316). According to Beaver, "we were really talking about body shapes." (Docket Entry No. 75, Exhibit Y, Attachment thereto Beaver Deposition at p. 48).

Gibson's Westheimer settlement agreement approved of a "Modified Design" and any failure by Westheimer to so modify "is subject to being challenged by Gibson as an infringement." (Exhibit 52 at 803–04).

In enforcing its trademark rights in its Les Paul, Beaver sent a letter to Harmony International in Seoul, Korea. (*Id.* at Exhibit 34, L. Beavers letter 11/9/99 to Harmony International, at 530). Beaver's letter listed examples of changes to the guitars Gibson's mark:

"you can, for example, change the body shape of your guitar to be much more rounded in the area of the horn as shown on the Attached Exhibit A or to be much more pointed on the area of the horn as shown on the Attached Exhibit B.

You should also make changes in the pickguard and hardware arrangements. For example, the pickguard shape may be changed to something like that show in the attachment Exhibit C. You should modify the positioning of the central knobs and you should remove the larger washer from the control switch on the guitar.

*Id.* at 530.

Gibson's correspondence in October, 1999 with DT International also suggested modifications of DT's "pickguard shape

and fretboard inlays pickguard shape, removal of the washer behind the toggle switch, change the horn shape," to be "more elongated" and reverse the diamond pattern of the control knob layout or "make it a square" pattern. (*Id.* at Exhibit 35, L. Beavers letter 10/29/99, at 537–38).

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed.1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Accord, Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir.1989).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forth with if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. *Emmons v. McLaughlin*, 874 F.2d 351, 355–57 (6th Cir.1989). *But see Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir.1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in *Celotex*

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a gen-

uine issue of material fact.... [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

*Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." *Martin v. Kelley,* 803 F.2d 236, 239, n. 4 (6th Cir.1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. *Sims v. Memphis Processors, Inc.,* 926 F.2d 524, 526 (6th Cir.1991)(quoting *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989) (quoting *Celotex* and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]... must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989)(quoting *Liberty Lobby* ). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to deter-

mine whether the respondent's claim is 'implausible.'

*Street,* 886 F.2d at 1480 (cites omitted). See also *Hutt v. Gibson Fiber Glass Products,* 914 F.2d 790, 792 (6th Cir.1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" quoting *Liberty Lobby* ).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, *summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.*

\* \* \* \* \* \*

Progressing to the specific issue in this case, we are convinced that *the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.* If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, *the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.* The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by*

*a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'*

*Liberty Lobby*, 477 U.S. at 248, 252, 106 S.Ct. 2505 (citation omitted and emphasis added).

It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

*Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." *Duchon v. Cajon Company*, 791 F.2d 43, 46 (6th Cir.1986) *app.* 840 F.2d 16, 1988 WL 12800 (6th Cir.1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however,

does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." *Webster's Third New International Dictionary* (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

*InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989). Here, the parties have given references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In *Street*, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a

motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the 'scintilla rule' applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible'.

*Street,* 886 F.2d at 1479–80.

█ The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

█ Federal courts possess jurisdiction of an action arising under the Lanham Act. 15 U.S.C. §§ 1116(a) and 1121(a). "Infringement law protects consumers from being misled by the use of infringing marks and also protects producers from unfair practices by an "imitating competitor"" *Moseley v. V. Secret,* 537 U.S. 418, 428, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003) (quoting *Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)). Gibson has the burden of proof for its infringement claims and under 15 U.S.C. § 1114(1), Gibson must show actual use of the trademark, and that the defendant used the same or a similar designation as a trademark. *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions,* 134 F.3d 749, 753 (6th Cir.1998).

### 1. The Validity of Gibson's Les Paul Trademark

█ In infringement actions, the court may also determine the right to registration [and] order the cancellation of registrations, in whole or in part . . ." 15 U.S.C. § 1119. For a registered mark, the registration is *prima facie* evidence of validity, ownership, and exclusive right to use the mark, but a registration "shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such

mark had not been registered." 15 U.S.C. § 1115.

Yet, Gibson has an "incontestable" trademark claim for its Les Paul Guitar and by statute "registration shall be conclusive evidence of the registrant's exclusive right to . . . use the registered mark" 15 U.S.C. § 1115(b), subject to certain statutory defenses. 15 U.S.C. § 1115(b)(1) through (9). Thus, Gibson's incontestable registration can be overcome. In *Park 'N Fly Inc. v. Dollar Park and Fly*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), the Supreme Court made it clear that:

> With respect to incontestable trade or service marks, § 33(b) of the Lanham Act states that "registration shall be conclusive evidence of the registrant's exclusive right to * * use the registered mark" *subject to the conditions of § 15 and certain incorporated by reference subsections (c) and (e) of § 14, 15 U.S.C. § 1064. An incontestable mark that becomes generic may be canceled at any time pursuant to § 14(c). That section also allows cancellation of an incontestable mark at any time if it misrepresents the source of the goods or services in connection with which it is used, or if it was obtained fraudulently or contrary to the provisions of § 4, 15 U.S.C. 1054 or §§ 29(a)-(c), 15 U.S.C. 1052(a)-(c).*

*Id.*, at 194–95, 105 S.Ct. 658.

The Supreme Court noted that during the incontestable registration process, all interested and opposing parties are given notice and an opportunity to object before an incontestable registration is issued.

> Respondent is simply wrong to suggest that third parties do not have an opportunity to challenge applications for trademark registration. If the Patent Office examiner determines that an applicant appears to be entitled to registration, the mark is published in the Official Gazette. § 12(a), 15 U.S.C.

§ 1062(a). Within 30 days of publication, any person who believes that he would be damaged by registration of the mark may file an opposition. § 13, 15 U.S.C., § 1063. Registration of a mark provides constructive notice throughout the United States of the registrant's claim to ownership. § 22, 15 U.S.C. § 1072. Within five years of registration, any person who believes that he is or will be damaged by registration may seek to cancel a mark. § 14(a), 15 U.S.C. § 1064(a). A mark may be canceled at any time for certain specified grounds, including that it was obtained fraudulently or has become generic. § 14(c), 15 U.S.C. § 1064(c).

*Id.* at 202, 105 S.Ct. 658.

Legal challenges to an incontestable trademark registration are limited, subject to the conditions and the seven defenses enumerated in 15 U.S.C. § 1115(b), that provides, in pertinent part, as follows:

> To the extent that the right to use the registered mark has become incontestable under section 15 [15 U.S.C. § 1065], the registration shall be conclusive evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce. Such exclusive evidence shall relate to the exclusive right to use the mark . . . with the goods . . . specified in the affidavit filed under the provisions of section 15 [15 U.S.C. § 1065] . . . subject to the following defenses or defects:

> "(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

> "(2) That the mark has been abandoned by the registrant; or

> "(3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the

source of the goods or services in connection with which the mark is used; or

"(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

"(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter or publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, that this defense or defect shall apply only for the area in which such continuous prior use is proved; or

"(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

"(7) That the mark has been or is being used to violate the antitrust laws of the United States." or

(8)That the mark is functional; or

(9) That equitable principles, including laches, estoppel and acquiescence, are applicable

According to the legislative history, the functionality defense was added in 1998. See H.R. 105–194 at 5, 105th Cong. 1st Session, 1997 reprinted at 1997 WL 408421 (Legis.History).

■ As relevant here, the Fourth Circuit has held that as a matter of law, an incontestable registration cannot be challenged on functionality grounds. *Shakespeare Co v. Silstar Corp. of America,* 9 F.3d 1091, 1097 (4th Cir.1993) (applying *Park'n Fly* ). In contrast, the Eleventh Circuit has held that because functionality is a judicially created defense that preceded the Lanham Act, and Congress did not expressly refer to this doctrine in the Lanham Act or its amendments thereto, the functionality doctrine continues to obtain in a challenge to an incontestable trademark. *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.,* 177 F.3d 1204, 1212, 1212 (4th Cir.1999). The Sixth Circuit has noted this split in the Courts, but has not had the occasion to reach the merits of this issue. *The Antioch Co. v. Western Trimming Corp.,* 191 F.3d 451, 1999 WL 777556 *5, n. 6 (6th Cir.1999). In addition to the 1998 amendment to § 1115(b), the Court adopts the Eleventh Circuit's holding in *Pudenz* as the more persuasive and concludes that functionality remains a basis to challenge Gibson's incontestable trademark.

■ An incontestable trademark remains subject to the "likelihood of confusion" test The Sixth Circuit has so held in the context of a contestable registration, *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.* 78 F.3d 1111, 1118 (6th Cir.1996) and as to incontestable trademarks. *Therma–Scan Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 632 (6th Cir.2002). ("Even where a trademark is incontestable and worthy of full protection, the significance of its strength will depend upon its recognition by the members of the public strength.") (Quoting *Wynn Oil v. Thomas,* 839 F.2d 1183, 1187 (6 th Cir.1988). Accord *Petro Stopping Centers v. James*

*River Petroleum, Inc.,* 130 F.3d 88, 92 (4th Cir.1997)).

■ Since *Therma–Scan,* the Sixth Circuit has stated that "where a mark registered on the federal principal registry is merely descriptive and has become incontestable pursuant to 15 U.S.C. § 1065, the mark is presumed to have acquired a secondary meaning." *Nartron Corp. v. STMicroelectronics, Inc.,* 305 F.3d 397, 404, n. 7 (6th Cir.2002) (citation omitted). Moreover, "because the mark at issue was incontestable registered mark, there is a presumption that the term is non-generic and the defendant bears the burden of overcoming this presumption." *Id.* at 400. (Citations omitted). In addition, "because [Plaintiff's] mark is incontestable then it is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter v. B & H Industries of Southwest Florida,* 880 F.2d 322, 329 (11th Cir.1989). "Strong marks, with greater secondary meaning, receive broader protection than 'weak marks.'" *Qualitex,* 514 U.S. at 167, 115 S.Ct. 1300 (quoting McCarthy §§ 11.24–11.25). Moreover, in this Circuit, where "[a defendant] has offered evidence that [Plaintiff's] mark has been weakened by widespread use of similar marks, the evidence is *not* sufficient to rebut *as a matter of law* the presumption conferred by incontestable status." *Jet Inc. v. Sewage Aeration Systems,* 165 F.3d 419, 422 (6th Cir.1999). (emphasis added).

■ The Court concludes that under *Qualitex, Nartron* and *Dieter,* Gibson's incontestable trademark for its Les Paul Single cutaway guitar has a secondary meaning and is a "strong" mark that is not generic and is entitled to greater protection. The Court also concludes that under *Jet,* PRS's proof of widespread production and use of similar guitars to Gibson's Les Paul, is insufficient as a matter of law and does not warrant further consideration.

■ As to PRS's challenge that Gibson's mark was fraudulently obtained, the factual predicates are that contrary to Zebrowski's affidavit, Les Paul was not continuously manufactured and sold in the 1960's and that similar shape guitars were in the market place at that time. Yet, the proof shows that the USPTO was aware of these latter facts before issuing the first registration. (Docket Entry No. 75, Exhibit S). In any event, the statute on incontestable marks requires only five years of continuous use. For trademark protection, Gibson must only show the "mark's use in commerce." *Rock and Roll Hall of Fame and Museum Inc. v. Gentile Productions,* 134 F.3d 749, 758 (6th Cir. 1998) (citing and quoting 15 U.S.C. § 1127.) There is not any factual dispute that at the time of Gibson's applications, the Les Paul guitar had been in continuous use for five years.

■ Any cited inconsistencies in an applicants' papers must be material to set aside a registered mark. *Eastern America Trio Products Inc. v. Tang Electronic Corp.,* 97 F.Supp.2d 395, 402, n. 30 (S.D.N.Y.2000) and authorities cited therein. Clear and convincing evidence is required for a showing of fraud to invalidate a trademark registration. *Resorts of Pinehurst Inc. v. Pinehurst National Corp.,* 148 F.3d 417, 420 (4th Cir.1998); *Metro Traffic Control Inc. v. Shadow Network Inc.,* 104 F.3d 336, 340 (Fed.Cir.1997); *eCash Technologies Inc. v. Guagliardo,* 127 F.Supp.2d 1069, 1079 (C.D.Cal.2000). Such proof is lacking here. The Court concludes that this contention lacks merit.

■ PRS next cites the difference between the Les Paul guitar and the two dimensional drawing that was submitted for Gibson's trademark. As the Federal Circuit observed:

"We have carefully examined all of these cases and find that one has bearing on

the situation before us in which an original application is internally inconsistent as to what the mark is. The specimens displaying one mark and the drawing a slightly different mark which inconsistency the applicant tried to correct by a drawing amendment to eliminate the inconsistency thus making clear what *is* the mark sought to be registered. It serves only a matter of common sense and sound trademark law that the specimens show what mark is owned by the applicant, ownership being a prerequisite to registration, and one should look to the specimens, in the case of inconsistency to determine what an applicant wishes to register, not to a clearly inconsistent and erroneous drawing made by is attorney."

*In re ECCS, Inc.,* 94 F.3d 1578, 1581 (Fed. Cir.1996). (emphasis added) The Trademark Appeals Board ruled that drawing "must create the same general commercial impression or create the impression of being the same mark." *In re Finlay Fine Jewelry Corp.,* 41 U.S.P.Q.2d 1152, 1154, 1996 WL 754046 (T.T.A.B.1996).

The Court follows *ECCS* to conclude that any variations between Gibson's drawings and the Les Paul guitar are not controlling. The core consideration is whether the Les Paul guitar is covered by Gibson's trademark. Here, the undisputed facts are that the Gibson's Les Paul guitar is the same shape of the guitar shown in Gibson's trademark and application papers. Pictures of the Les Paul guitar, as well as pictures from market publications and business records about the Les Paul guitar were part of Gibson's application papers upon which the USTPO issued Gibson's trademark registrations. The Court concludes PRS's contention about the Gibson's drawing lacks merit

## 2. Functionality

For a trademark infringement action under 15 U.S.C. § 1114, "[t]he touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *PACCAR Inc. v. TeleScan Tech., L.L.C.,* 319 F.3d 243, 249 (6th Cir. 2003) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir.1997)).

 Yet, before an analysis of these eight factors, the Court addresses PRS's functionality argument, that if supported, renders moot any consideration of other infringement issues. "Trademark law does not protect the functional features of products because such protection would provide a perpetual monopoly of features which could not be patented." *Esercizio v. Roberts,* 944 F.2d 1235, 1246 (6th Cir. 1991). Gibson's trademark is a product design and in *Qualitex,* the Supreme Court noted that "in general terms, a product is functional, and cannot serve as a trademark 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." 514 U.S. at 165, 115 S.Ct. 1300. (Quoting *Inwood Laboratories Inc., v. Ives Laboratories Inc.,* 456 U.S. 844, 850, n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Moreover, the Supreme Court observed that:

[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or function for a limited time after which competitors are free to sue the innovation. If a product's func-

tional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex,* 514 U.S. at 164–65, 115 S.Ct. 1300 (internal citations omitted).

In *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001), the Supreme Court stated: "product design almost invariably serves purposes other than source identification." "[t]he Lanham Act... does not protect [trademark] in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacture or seller." (quoting *Wal–Mart Stores Inc. v. Samara Bros.,* 529 U.S. 205, 213, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)). Yet, "[t]he Court has allowed trade dress protection to certain product features that are inherently distinctive... The trade dress in those cases did not bar competitors from copying functional product design features." *TrafFix Devices,* 532 U.S. at 33, 121 S.Ct. 1255.

The Sixth Circuit has ruled that the fact "[t]hat an item serves or performs a function does not mean...that it may not be at the same time be capable of indicating sponsorship or origin in where aspects of the item are nonfunctional." *Ferrari,* 944 F.2d at 1247 (quoting *WSM Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983)). Further, "[e]ven if the elements... were separately functional... arrangement of these features can constitute more than the sum of its non-protectable parts." *Antioch Co. v. Western Trimming Corp.,* 347 F.3d 150, 158 (6th Cir. 2003) (quoting *Abercrombie & Fitch Stores Inc. v. American Eagle Outfitters, Inc.,* 280 F.3d 619, 644 (6th Cir.2002)). Moreover, "a design is functional only if [functional] benefits cannot practically be duplicated through the use of the design." McCarthy § 7:75 (quoting Restatement).

 The proof on functionality focuses on the design of the horn that Gibson's chief executive officer described as giving the guitar player access to the strings. The Court however, concludes that this horn shape has not been shown to be essential to the Les Paul or any other guitar. The proof reflect various guitars with varying locations of the knobs and switches. A guitar and this guitar can function without a single horn and the proof reflects a variety of horns of guitars that serve the same function. The other parts, knobs, frets and switches serve essential functions, but not as to their locations or arrangement on the guitar.

The Court concludes that the shape of the Les Paul guitar as well as the placement of these knobs and switches "constitute more than the sum" of their individual roles and collectively create a unique guitar that the guitar market has long recognized as unique. Thus, the Court concludes that PRS's functionality contention lacks merit.

### 3. Gibson's Lanham Act Claims

The Sixth Circuit described the multiple purposes of the federal trademark laws and their effect in the marketplace:

Although trademark protection may have had its start in common law as an action in fraud, over the past one hundred fifty years it has come to focus also on protecting property interests in trademarks themselves. This shift is the result of the recognition of the purposes trademarks serve in the modern, impersonal economy. *They act as a means of identifying a product as coming from or being associated with a particular, although anonymous, source, and inducing subsequent pur-*

*chases by consumers.* As a commentator pointed out sixty years ago:

> The fact that through his trademark the manufacturer or importer may "reach over the shoulder of the retailer" and across the latter's counter straight to the consumer cannot be over-emphasized, for therein lies the key to any effective scheme of trademark protection.... [A trademark is] not merely the symbol of good will but often the most effective agent for the creation of good will, imprinting upon the public mind an anonymous and impersonal guaranty of satisfaction, creating a desire for further satisfactions. The mark actually *sells* the goods.

Schecter, *The Rational Basis of Trademark Protection,* 40 Harv. L.Rev. 812, 818–819 (1927) (emphasis original).

In a word, "trademark law now pursues two related goals—the prevention of deception and consumer confusion, and, more fundamentally, the protection of property interests in trademarks." *Ameritech, Inc. v. American Inf. Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987) (emphasis added).

Gibson's federal trademark infringement claim is for violations of the Lanham Act that provides, in pertinent part, as follows:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or *colorable imitation* of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake,* or to deceive;

\*　　\*　　\*　　\*　　\*　　\*

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a) (emphasis added).

 The likelihood of confusion tests has eight factors to be considered by the Court:

1. strength of plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant' intent in selecting the mark; and
8. likelihood of expansion of the product lines.

*Landham v. Lewis Galoob Toys, Inc.,* 227 F.3d 619, 626–27 (6th Cir.2000) "[These factors] imply no mathematical precision, and a plaintiff need not show that all, or even most of the factors listed are present in any particular case to be successful.'" *Id.* quoting *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988).

### a. Strength of Gibson's Mark

 The strength of a mark depends on its distinctiveness, which is a factual determination. *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 280. "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Id.* (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir.1985)). "A mark is strong and distinctive when 'the public readily accepts it as the hallmark of a particular source;' such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Id.* (quoting 3A RUDOLPH CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES P. 20.43 (4th ed.1983)). The Sixth Circuit examines

several variables in assessing the strength of a mark, including the incontestability of the mark, its arbitrariness, the existence of similar-third party registrations, and consumer recognition of the mark. *See Daddy's Junky Music Stores, Inc.,* 109 F.3d at 280–282.

An "incontestible status serves to confer upon a mark the strength accorded to a descriptive mark with secondary meaning. Accordingly, incontestible status benefits those marks which otherwise would lack inherent strength, i.e., generic marks or descriptive marks without secondary meaning." *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 282. Aside from the incontestable registration, the undisputed proof reflects that Gibson's Les Paul single cutaway guitar is a "classic" in the guitar market. Smith, PRS's principal partner recognized the Gibson's by its distinctive shape. Market and television advertisements reflect the strong distinctive trademark of Gibson's Les Paul. This factor weighs heavily in Gibson's favor. Given Gibson's incontestable registration for the Les Paul guitar and its proof of widespread and longstanding recognition of the Les Paul guitar in the guitar market, the Court concludes that Gibson's trademark for its Les Paul guitar is a "strong mark and worthy of full protection." *Wynn Oil,* 839 F.2d 1183, 1187.

### b. Relatedness of the Goods or Services

On this factor, the Court must inquire: "are the goods and services so "related so that they are likely to be connected in the mind of a prospective purchaser?" " *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1109 (6th Cir.1991). (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 159 (9th Cir.1963)).

The evidence reflects that the parties are in direct and primary competitors in the high price electric guitar market. Gib-

son' Les Paul and PRS's Singlecut are both high price and quality guitars. These guitars and their strikingly similar in appearances and designs lead the Court to conclude that these products are closely related and this factor favors Gibson.

### c. Similarity of the Marks and Degree of Purchaser Care

To analyze properly the similarity of marks, a court must examine the "pronunciation, appearance and verbal translation of competing marks." *Wynn Oil Co.,* 839 F.2d 1183, 1187 (6th Cir.1988). Courts should examine the marks in their entirety, focusing on their "overall impression, not individual features." *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 283. A court must determine whether a given mark would confuse the public when viewed alone, and not in a side-by-side comparison. *Id.* Accord, *Wynn Oil Co.,* 839 F.2d at 1187. The degree of purchaser care factor is, however, relevant to the similarity of marks analysis. *Gray v. Meijer, Inc.,* 295 F.3d 641, 649–50 (6th Cir. 2002), 2002 U.S.App. LEXIS 14276 * 19, 20.

From the Court's review of the appearances of the two products and the testimony about them, the only reasonable conclusion is that the Singlecut is striking similarly to Gibson's Les Paul: in its display and shape of the horn and configuration of the knob features. PRS also uses an effect of the sunburst color this is similar in appearance to the sunburst on the Les Paul guitar. The length difference in these guitars is 1/4". Any differences in the surface shape are insignificant, particularly as to advertising. The differences cited by PRS would not impact this conclusion. This conclusion is corroborated by other proof in the PRS meeting notes that PRS made its Singlecut to be a "colorable imitation" for Gibson's Les Paul to secure Gibson's former distributor.

### d. Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion. Yet, it does not follow that lack of evidence of actual confusion should be a significant factor" because actual confusion is merely one factor to be considered by the court. *Wynn Oil Co.*, 839 F.2d at 1188. Under the Lanham Act, "a successful Lanham Act plaintiff only must show a sufficient **potential** of confusion, not actual confusion." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284. (emphasis in the original).

There are few documented instances of actual confusion. The Court notes that any confusion would be at the initial viewing of the guitars. Personal inspection of these high price guitars that are sold with clear markings of their origins would dispel the initial confusion. In terms of actual confusion, this factor favors PRS. *See Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1120 (6th Cir.1996) (stating that "four incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion").

The facts here however, fall under the "initial interest confusion" doctrine [8] that has been followed by the Second and Ninth Circuits. In sum, this doctrine applies where the defendant's of another's trademark in a manner is calculated "to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1062 (9th Cir.1999) (Quoting *Dr. Seuss Enterprises L.P. v. Penguin Books USA, Inc.*,

109 F.3d 1394, 1405 (9th Cir.1997) and citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir.1987)). In such instances, there " may be still an infringement." *Id.*

In *Brookfield*, the Ninth Circuit cited Ferrari and *Blockbuster Entertainment Group v. Laylco, Inc.*, 869 F.Supp. 505, 513 (E.D.Mich.1994) ("Because the names are so similar and the products sold are identical, some unwitting customers might enter a Video Busters store thinking it is somehow connected to Blockbuster. Those customers probably will realize shortly that Video Busters is not related to Blockbuster, but under [*Ferrari S.P.A. Esercizio v. Roberts*, 944 F.2d 1235 (6th Cir. 1991) ] and *Grotrian* that is irrelevant."). *Id.*

The high price of the parties' guitars, the sophisticated buyers and the opportunity for actual inspection at the point of the sale do not preclude "potential confusion" as to the origin of the PRS Singlecut. The Sixth Circuit has stated that the Lanham "Acts protection is not limited to confusion at the point of sale." *Ferrari*, 944 F.2d at 1245. Moreover, the Sixth Circuit did not find the presence of sophisticated buyers to render moot the prospect of actionable confusion:

> The district court did not clearly err in concluding that the relevant customers are sophisticated about the services in question and that the services are expensive adding incentives for the sophisticated consumer to exercise care in his or her selection. The evidence uniformly supports this conclusion. Nevertheless, the court erred, we thing, in according this one factor disproportionate significance. "[T]he expertise of

---

**8.** This doctrine appears similar to the "bait for the switch" or "foot in the door" trade practice described by commentators as occurring where the junior user imitates the senior

user product to gain market entry. Richard L Kilpatrick, "Likelihood of Confusion in Trademark Law," § 1.7 (Practising Law Institute 2001).

purchases does not necessarily preclude a finding that confusion is likely...where the products are identical, the sophistication of buyers cannot be relied on to prevent confusion."

*Champions Golf Club,* 78 F.3d at 1121, (quoting *Homeowners* 931 F.2d at 1111 and *McGregor–Doniger v. Drizzle, Inc.,* 599 F.2d 1126, 1137 (2nd Cir.1979)). Accord, *Hermes International v. Lederer de Paris Fifth Avenue Inc.,* 219 F.3d 104, 108–09 (2nd Cir.2000).

Given the striking similarity of the PRS Singlecut to Gibson's Les Paul and the instant market recognition of Gibson's Les Paul, the Court, concludes that initial confusion would occur in the marketplace between parties' products as to the "Singlecut" guitar's source. This factor favors Gibson.

### 4. Marketing Channels Used and Likelihood of Expansion of Lines

This factor considers the similarities and differences between the "predominant customers" of the parties' respective goods" and whether their marketing approaches resemble each other. *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 285 (citing *Homeowners Group,* 931 F.2d at 1110).

The undisputed facts are that Gibson and PRS customers are high price guitar consumers. The parties distribute their goods through the same type of retailers. Both parties do not sell over the Internet.

### 5. PRS's Intent in Selecting its Singlecut Guitar

The presence of intent constitutes strong evidence of confusion. *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 287 (citing *Wynn Oil Co.,* 839 F.2d at 1189). Intent need not be shown by direct evidence of intentional copying. *Id.* at 286. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. Further, the extensive advertising

and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark." *Id.* (citation omitted). The Sixth Circuit summarized the impact of intent as "an issue whose resolution may benefit only the cause of the senior users, not of an alleged infringer." *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 287.

Although PRS claims a lack of knowledge of Gibson's trademark registration, as a sophisticated manufacturer with several trademarks, with Gibson's Les Paul widespread recognition in the marketplace and given Smith's statement of recognizing Gibson's Les Paul by its shape, the Court concludes that PRS knew that the Les Paul would be subject to trademark protection.

In the Court's view, the notes of the several PRS meetings reflect PRS's intent to imitate Gibson's Les Paul so as to enter the market and exploit Gibson's dispute with its retailer that wanted a substitute single cutaway guitar. The Court does not fault any effort by PRS to compete, but concludes that PRS's meeting notes clearly reflect that PRS was imitating the Les Paul. The PRS had never manufactured a single cutaway guitar and had never manufactured a four knob combination on its guitars. PRS repeated references that this Singlecut product would be viewed as a copy of Gibson's Les Paul reflect PRS's awareness of its imitation of the Les Paul guitar. PRS's minor adjustments to attempt to distinguish the PRS Singlecut, clearly do not avoid the striking similarity of its appearance to Gibson's Les Paul guitar.

In considering the intent factor, the Court concludes this factor strongly supports Gibson.

### 6. Likelihood of Expansion of Products

Here, the undisputed proof is that PRS has considered the production of a less

expensive version of its Singlecut for product expansion. Such expansion would contribute further to the confusion between PRS's and Singlecut Gibson's Les Paul products in the marketplace.

### Conclusion

Based upon a consideration of the eight factors, the Court concludes that most of these factors favor Gibson's claim for PRS's violation of its incontestable registered trademark for the Les Paul Guitar. Thus, given this conclusion, the applicable law and undisputed facts, the Court concludes that Gibson's motion for partial summary judgment should be granted.

Given the Court's conclusions on Gibson's claims for trademark infringement of its incontestable registration and PRS's defenses and claims related thereto, the Court does not consider it necessary to address Gibson's other claims of counterfeiting, trademark dilution and unfair competition. The Court also deems it unnecessary to address any state law claims. For the reasons set forth above, PRS's motion for summary judgment is denied.

The parties have ninety (90) days from the date of entry of the accompanying Order to complete any discovery on damages or disgorgement of PRS's profits on the sales of its offending Singlecut guitar. *WSM,* 709 F.2d at 1086.

Although the Court has reservations about filing this Memorandum under seal, given the parties' submissions under seal, this Memorandum shall remain under seal for ten (10) days from the date of entry of the accompany Order, to allow the parties to justify why this Memorandum should not be unseal. This Memorandum shall be filed and remain under seal pending further order of the Court.

An appropriate order is filed herewith.

### ORDER

In accordance with the Memorandum filed herewith, Plaintiff Gibson Guitar Cor-

poration's motion for partial summary judgment (Docket Entry No. 61) is **GRANTED.** The Defendant Paul Reed Smith Guitars, LP's motion for summary judgment (Docket Entry No. 64) is **DENIED.**

The parties have ninety (90) days from the date of entry of the accompanying Order to complete any discovery on damages or disgorgement of PRS's profits on the sales of its offending Singlecut guitar.

The accompanying Memorandum shall be filed and remain under seal pending further order of the Court.

It is so **ORDERED.**